UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————

UNITED STATES OF AMERICA,                )
                                         )
                                         )
                                         )
v.                                       )        Criminal Action No. 14-10296-LTS
                                         )
CIRILO GARCIA-GONZALEZ,                  )
                                         )
                                         )
                                         )
———————————————————)

ORDER ON MOTION TO SUPPRESS

September 1, 2015

SOROKIN, J.

A grand jury indicted Defendant Cirilo Garcia-Gonzalez for Conspiracy to Distribute

Heroin in violation of 21 U.S.C. § 846, Structuring to Avoid Reporting Requirements in

violation of 31 U.S.C. § 5324(a)(1), Aiding and Abetting in violation of 18 U.S.C. § 2, and

Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h).  With trial looming, Garcia-

Gonzalez filed (after obtaining leave to file it late) a motion to suppress evidence acquired from

two separate pole cameras aimed at the outside of Garcia-Gonzalez's homes during the course of

the investigation, as well as the fruits therefrom.  The Government opposes.[1]  The facts are

drawn from the parties' submissions on the motion, the parties' stipulation of facts, and the

evidentiary hearing the Court held on July 31, 2015 and August 3, 2015.

---

[1] The defendant also moved to suppress testimony and evidence relating to a July 13, 2014 car stop.
See Doc. 49 at 12. As the government does not seek to introduce any of the fruits of that stop into evidence, Doc. 59 at 30, this motion is moot.

**Factual Findings**

Law enforcement agents obtained a warrant to track a particular phone based upon probable cause that the phone was in service of the distribution of controlled substances in violation of law.  Evidence from the tracking revealed that, by December 6, 2013, the phone traveled to 279 Howard Street in Lawrence, Massachusetts.  In an effort to identify the individual actually using the phone (then unknown to law enforcement), the investigating agents decided, "[a] short time later," to employ a pole camera to capture the comings and goings from 279 Howard Street.  Interestingly, the agents did not need to install a camera.  As luck would have it, the FBI already had a camera aimed at an adjacent property on Howard Street ("Howard Street Camera").  In cooperation, the FBI made access to the camera available to the investigating agents in this case.  Though then in service of the FBI, the camera was, in fact, owned and controlled by the Massachusetts State Police.  Doc No. 59 at 2.

The Howard Street Camera sent a live video stream to a state police server accessible from any location with internet access to the four or five agents involved in this investigation via a secure link.  The agents had the ability to remotely zoom in on objects observed in the video stream as well as pan the camera left and right.  The zoom and pan functions operated only on the live stream, albeit, at times, with some delay.  The zoom function enabled the agents to read, plainly and clearly, the license plate on a car, Doc. No. 76 ¶ 3, or see a wad of money in the hands of a person opening a car door, Doc. No. 59 at 4.  The server saved the video stream for several days, after which it overwrote the video.  The agents had access to the saved stream to review it until it was overwritten in the normal course.  During their review, they could jump to a particular spot in the recorded stream (e.g. Sunday at 2:00 p.m.).  They could also magnify an

image.  Magnification would not permit reading a license plate; it was not as effective a tool as the zoom function.  Compare Government Exhibit 4 and Government Exhibit 6.  The agents could, and to some extent did, preserve some of the video surveillance by saving a portion of the surveillance either as a video clip or as a still photograph from the video.  The Howard Street Camera did not possess so-called night vision capability or any other special features.

Number 265 Howard Street is a three family home facing Howard Street.  A paved driveway, approximately three cars wide, sits between 265 Howard Street and the multi-family home located next door called, for present purposes, 279 Front Howard Street.  Number 279 Front Howard Street contains approximately four or five apartments, and appears from the outside as a large or deeper–than–normal three decker.  A wrought iron fence blocks either side of the driveway from the street but does not bar the center of the driveway.  Although the fence contains a sliding gate, it was never closed during the relevant time period and, in any event, it does not obstruct a passerby's view.  Number 279 Howard Street sits in the backyard of 279 Front Howard Street, behind but slightly to the right—that is toward the driveway separating 279 Front and 265—of 279 Front Howard Street, when viewed from Howard Street.  Number 279 does not abut Howard Street.  The driveway separating 279 Front and 265 Howard Street runs from Howard Street along the side of both 279 Front and 265 Howard Street and then the length of 279 Howard Street, which faces a parking area for cars (apparently for these three properties or some subset) behind 265 Howard Street.  There appears to be a door to 279 Howard Street which faces the back of 279 Front Howard Street.  This door is not depicted in the Howard Street Camera's view, though to reach it you must pass through the area viewed by the camera.  There is also an entrance on the side of 279 Howard Street facing Howard Street and the driveway.  A portion of this door is within the Howard Street Camera's view, and anyone entering or exiting

the door must pass through the Howard Street Camera's line of sight.  This is the door Garcia-Gonzalez and his guests used exclusively to enter and exit his unit.  Each of the three units in 279 Howard Street also has a private balcony facing the common driveway.  Exhibit 2 (Doc. No. 70-2) depicts the area of these three homes well.  The Howard Street Camera captures the activities on the balconies.  See Doc. Nos. 70-2, 70-3, 59 at 4 (video excerpt).

In this case, the investigating agents gathered evidence from a camera mounted in a public place aimed at the driveway area described above.  The camera captured the entire driveway from Howard Street to the end of the driveway at the back of 279 Howard Street, the side door—but not the front door—of 279 Howard, the balconies of each unit at 279 Howard Street, and both the front and one side of both 279 Front and 265 Howard Street.  The Howard Street Camera surveilled every person coming and going to 279 Howard Street, any car that went down the driveway leading to 279 Howard Street (and cars did), and any activity occurring (and some did) on the balconies of each apartment at 279 Howard Street.  Everything the camera captured was visible to a passerby (or agent in a car conducting surveillance) armed with binoculars (to be able to see the smaller details such as license plate numbers, etc.) and cameras. From December 8, 2013 until at least June 2014, agents observe the Howard Street Camera on a daily basis.  Though the agents monitored the video much less frequently, if at all, after that, they did not ultimately turn it off until Garcia-Gonzalez was arrested.

At some point in January 2014, agents came to believe Garcia-Gonzalez had moved to 430 Essex Street, Lawrence.  Essex Street is a major commercial street in Lawrence.  Number 430 contains several apartments above a commercial establishment.  The only means in and out of the apartments is through a door on the back of the building.  Behind the building is a commercial parking lot operated by the City of Lawrence and open to anyone. Garcia-Gonzalez

4

frequently parked in this lot.  In order to continue their surveillance, the agents, shortly

thereafter, went to install a pole camera to observe the parking lot behind 430 Essex Street and,

again, the FBI was already using a pole camera owned and operated by the Massachusetts State

Police to observe 430 Essex Street (due to another investigation involving a different apartment).

This camera ("Essex Street Camera") had the same capabilities as the Howard Street Camera.  It

observed the public commercial parking lot behind 430 Essex Street and the back of the

buildings in the same block as 430 Essex (all of which contain commercial establishments on the

first floor), including the entrance door accessing the 430 Essex Street Apartments.  The parking

lot is illuminated at night, thus permitting observation after dark.  Anyone entering or exiting the

apartments at 430 Essex Street must pass through the parking lot, and thus within the view of the

pole camera.  Agents observed the stream on a daily basis until April 30, 2014, after which they

observed it less frequently, about a few times per week.

        The video surveillance at Howard and Essex Streets was used to establish probable cause

for a series of state GPS warrants for several vehicles associated with the Defendant.  It also led

to the seizure of $133,850 in U.S. currency from the Defendant during a traffic stop and,

separately, the seizure of heroin from another party.  Doc. No. 76 ¶¶ 5, 9, 11.  The pole cameras

enabled the investigating officers to identify the person carrying the phone they tracked, to

identify associates of the person, to identify the car(s) used by the person and/or associates, to

see which combination of persons met, to monitor every time the person came or went to his

home, to see each person coming to or leaving his home, to determine the date and times of the

comings and goings from the homes, to see what bags or other objects each person carried when

coming to and leaving from his home, and to build the investigation.

Physical surveillance, in theory, could gather the same information as the pole cameras. However, physical surveillance is difficult to perform.  Law enforcement resources are limited; they lacked the necessary complement of officers to conduct the type of round the clock surveillance the cameras conducted.  Moreover, here, the officers, even setting aside resource constraints, could not have successfully conducted this surveillance in person.  Garcia-Gonzalez (and others) likely would have discovered the surveillance.  The pole cameras permitted the officers to maintain secrecy, a significant advantage.  The comprehensive record created by the pole cameras, and both the efficiencies and time shifting it enables, are important attributes not available from physical surveillance.  During the period both cameras operated, the investigating officers had the ability to watch live streams from both cameras simultaneously, allowing them to accomplish more than either camera permitted alone, as the Defendant, at times, moved from one apartment to the other.  At no time did the agents obtain, or even seek, a warrant authorizing either the Howard Street Camera or the Essex Street Camera.  At no time did a physical trespass occur.

### Legal Standard and Conclusions of Law

Garcia-Gonzalez seeks to suppress both the evidence obtained from the two pole cameras and the fruits therefrom.  His motion presents two questions: first, whether the Constitution required agents to obtain a warrant for the use of the two pole cameras; and second, if so, whether suppression is appropriate.

Prior to United States v. Jones, 132 S. Ct. 945 (2012), courts accepted video surveillance of areas exposed to public view as permissible without a warrant.  See, e.g., United States v. Bucci, 582 F.3d 108 (1st Cir. 2009); United States v. Vankesteren, 553 F.3d 286, 291 (4th Cir. 2009); United States v. Jackson, 213 F.3d 1269, 1280-81 (10th Cir. 2000), judgment vacated on

other grounds, 531 U.S. 1033 (2000); United States v. Aguilera, No. 06-CR-336, 2008 WL

375210, at *2 (E.D. Wis. Feb. 11, 2008).  This was so even though the Supreme Court had left

open whether "twenty-four hour surveillance of any citizen of this country" violates the Fourth

Amendment.  United States v. Knotts, 460 U.S. 276, 283-84 (1983); but see Katz v. United

States, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his

own home or office, is not a subject of Fourth Amendment protection.").

In Jones, the Supreme Court found a violation of the Fourth Amendment arising from the

warrantless installation and monitoring of a GPS tracking device on an automobile.  The

"Opinion of the Court," written by Justice Scalia, and joined by four others, made three salient

points for purposes of Garcia-Gonzalez's motion. First, the officers in Jones committed a

physical trespass by installing the GPS tracker on the automobile, which violated the Fourth

Amendment.  132 S. Ct. at 949, 952.  Second, the Opinion affirmed that "the Katz reasonable-

expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory

test."  Id. at 952 (emphasis in original).  Third, the Court noted that "[i]t may be that achieving

the same result through electronic means, without an accompanying trespass, is an

unconstitutional invasion of privacy[.]"  Id. at 954.  Thus, Katz applies to Garcia-Gonzalez's

motion.

In order to establish a Fourth Amendment violation, Garcia Gonzalez must show: (1) a

subjective expectation of privacy; and (2) an expectation of privacy that society is prepared to

recognize as objectively reasonable.  Smith v. Maryland, 442 U.S. 735, 740 (1979) (citing Katz,

389 U.S. at 361 (Harlan, J., concurring)); United States v. Battle, 637 F.3d 44, 48-49 (1st Cir.

2011) (defendant has burden to show the requisite expectations of privacy).  Plainly, prior to

Jones, the motion would fail.  Courts, including the First Circuit, generally held that no search

occurred under this test when agents observed activity exposed to the general public, even when they did so by streaming video surveillance of a person's home for months on end.  See Bucci, 582 F.3d at 116-17 ("An individual does not have an expectation of privacy in items or places he exposes to the public.") (citing Katz, 389 U.S. at 351).  The Government advances that position.

When considering the legality under the Fourth Amendment of long-term video surveillance of an individual's activities or home, unquestionably the various opinions issued by the Justices in Jones require serious and careful consideration.  In Jones, Justice Alito wrote:

> In the pre-computer age, the greatest protections of privacy were neither constitutional nor statutory, but practical. Traditional surveillance for any extended period of time was difficult and costly and therefore rarely undertaken. . . . Devices like the one used in the present case, however, make long-term monitoring relatively easy and cheap. . . .
>
> The best that we can do in this case is to apply existing Fourth Amendment doctrine and to ask whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated.
>
> Under this approach, relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period. In this case, for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving. We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4–week mark. Other cases may present more difficult questions. But where uncertainty exists with respect to whether a certain period of GPS surveillance is long enough to constitute a Fourth Amendment search, the police may always seek a warrant.

132 S. Ct. at 963-64 (Alito, J., concurring in the judgment) (footnotes and internal citations omitted).

Three other justices joined in his opinion.  Justice Sotomayor, who also joined Justice Scalia's majority opinion, wrote a separate concurring opinion.  She wrote:

> Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private

aspects of identity is susceptible to abuse. The net result is that GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track—may "alter the relationship between citizen and government in a way that is inimical to democratic society."

I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements. . . . I would also consider the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power to and prevent "a too permeating police surveillance[.]"

Jones, 132 S. Ct. at 956 (Sotomayor, J., concurring) (internal citations omitted).

She also endorsed Justice Alito's opinion:

As Justice ALITO incisively observes, the same technological advances that have made possible nontrespassory surveillance techniques will also affect the *Katz* test by shaping the evolution of societal privacy expectations. Under that rubric, I agree with Justice ALITO that, at the very least, "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."

Id. at 955 (Sotomayor, J., concurring).

Garcia-Gonzalez urges the application of this reasoning.  He eloquently contends that the video surveillance in this case captured something not actually exposed to public view – the aggregate of all of his coming and going from the home, all of his visitors, all of his cars, all of their cars, and all of the types of packages or bags he carried and when.  The surveillance captured all types of intimate details of life centered on Garcia-Gonzalez's home. The agents saw when he came and went.  They saw his visitors.  They saw with whom he traveled.  They identified both his frequent and infrequent visitors.  They identified the cars each of them drove. They saw how he dressed every day.  They saw what he carried in and out of his home, even when he carried out his trash.  They knew when he stayed home and when he did not.  See United States v. Wymer, 40 F. Supp. 3d 933, 942 (N.D. Ohio 2014) (rejecting government's "mere nosy neighbor" analogy of pole camera running 24/7 for nearly five months); see also

California v. Ciraolo, 476 U.S. 207, 215 n.3 (1986) (video observation "may become invasive, either due to physical intrusiveness or through modern technology which discloses to the senses those intimate associations, objects or activities otherwise imperceptible to police or fellow citizens.").  The officers' observations occurred in an area next to, and closely proximate to, the door through which Garcia-Gonzalez entered and left his home.  Although the officers never entered the home, and never set foot on private property, the pole camera was akin to stationing a police officer at the front door by whom every person and object must pass.  The Supreme Court recently made clear that the Fourth Amendment "right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity."  Id.

The Government points to several facts it suggests mitigates the activity here.  First, both homes are in busy urban areas, thus not presenting the more private type of setting found in rural or some suburban areas.  However, the rights of citizens do not vary by location.  While facts are significant, the facts supporting the motion arise from surveillance by law enforcement officials of the comings and goings from Garcia-Gonzalez's homes.  Garcia-Gonzalez makes no claim that he shielded any of his individually surveilled actions from view.  Rather, his claim is that the continuous surveillance of all of these actions violates his rights.[2]

Next, the Government emphasizes that the door to the apartments at 430 Essex Street is exposed to a public commercial parking lot operated by the City of Lawrence a few feet away.[3]  That appears to be a distinction without a material difference in this case.  Garcia-Gonzalez's

[2] There is evidence that a private resident mounted a camera at 430 Essex St that served as a video doorbell, enabling the resident to see who sought entrance.  However, this surveillance does not diminish Garcia-Gonzalez's expectation of privacy from governmental surveillance, a distinction buttressed by the Fourth Amendment's inapplicability to private conduct.  See United States v. Jacobsen, 466 U.S. 109, 115 (1984).

[3] The photos appear to depict an alleyway behind the building at 430 Essex Street (and its abutters) which is not part of, though contiguous to, the public parking lot.

10

contention is that he possesses a reasonable expectation of his privacy in the whole or sum of his activities over an extended period of time that society recognizes as reasonable.  That contention is not defeated even though each single moment in time is exposed to the public.  This is certainly the example where the whole is greater, and different, than the sum of the parts.  Indeed, this is the very distinction Justice Alito drew in Jones.  See 132 S. Ct. at 964 (Alito, J., concurring in the judgment).  Knowing and reviewing all of a person's activities centered around the home differs greatly from knowing and observing a small bit on one day.  See United States v. Wells, 739 F.3d 511, 524 (10th Cir.) ("whether an individual has a reasonable expectation of privacy may depend in part on the nature of the government intrusion").  Further, the secret nature of the surveillance prevents the target from choosing to shield his behavior from public view.

Next, the Government relies principally on three post-Jones decisions upholding video surveillance.  None answer the contentions advanced by Garcia-Gonzalez, and one, to a degree, supports him.  The first, Wells, is simply not on point.  It concerned whether police officers conducting a consent search of a drug dealer's hotel room possessed a reasonable expectation of privacy in the hotel room such that the video recordings made of the officer's actions after the dealer (actually an undercover federal agent) left the room should be suppressed.  739 F.3d at 513.  The Court rejected the defendant officer's argument.  The decision turned on materially different facts—a hotel room rather than a home, a brief surveillance rather than months of 24/7 surveillance—and a significant policy consideration not presented by Garcia-Gonzalez's case— whether the law ought to cloak the activities of public officials discharging their lawful duties enforcing the law with a reasonable expectation of privacy under the Fourth Amendment.  See id. at 525.  Notably, of relevance to the pending motion, the Court opined that video surveillance

is one of the most intrusive forms of surveillance: "Video and audio surveillance are highly

intrusive forms of investigative mechanisms and, for that reason, have been subjected to a high

level of scrutiny under the Fourth Amendment and the wiretap statute, with video surveillance

deemed even more intrusive than audio 'bugging.' Wells, 739 F.3d at 518 (citations of 10th

Circuit cases omitted).

Second, the Government cites United States v. Brooks, 911 F. Supp. 2d 836 (D. Ariz.

2012).  The holding of this case—rejecting suppression of extensive video surveillance of the

defendant's home—supports the Government's position.  There, the Court reasoned that

everything captured by the camera was exposed to the public, in the sense that a member of the

public could have observed it, and, therefore, no Fourth Amendment violation occurred.  Id. at

843.  Because the Brooks decision does not analyze the significance of the aggregate nature of

the surveillance on the privacy analysis or the fact that the aggregate is not meaningfully exposed

to the public, the decision is of limited persuasive authority in resolving Garcia-Gonzalez's

contentions.[4]

Third, the Government cites United States v. Wymer, 40 F. Supp. 3d 933 (N.D. Ohio

2014).  There, the officers installed a video camera to observe the defendant's salvage business.[5]

As in this case, each individual action captured by the video camera could have been seen by a

member of the public.  The Court termed this "highly intrusive surveillance" but "despite []

considerable reservations about the failure of the officers to have secured a warrant," concluded

that "controlling law" required denial of the motion.  40 F. Supp. 3d at 936, 942.  In doing so, the

---

[4] Another case the government cites in its brief, United States v. Nowka, No. 5:11-cr-00474-WEH-HGD, 2012 WL 6610879 (N.D. Ala. Dec. 17, 2012), suffers from a similar defect of not addressing the effect of the aggregate nature of the pole camera surveillance in question, and likewise has little persuasive value.
[5] The defendant testified that he also had lived on this property in an RV trailer for a period of four months.  The Judge, however, did not credit this testimony, and found defendant had only a diminished expectation of privacy because his use of the property was almost entirely commercial.  Wymer, 40 F. Supp. 3d at 939.

Court relied on decisions in <u>Katz</u>, 389 U.S. at 351 (finding no expectation of privacy in "what a person knowingly exposes to the public"), <u>United States v. Mathis</u>, 738 F.3d 719, 732 (6th Cir. 2013) (rejecting Fourth Amendment protection where owner of commercial property "knowingly exposed the entire site to public access by not doing anything to exclude the public"), <u>United States v. Elkins</u>, 300 F.3d 638, 653 (6th Cir. 2002) ("it is clear that areas that adjoin a commercial building but are accessible to the public do not receive curtilage-like protection"), and <u>United States v. Parrilla</u>, No. 13 CR 360(AJN), 2014 WL 2111680, at *7-9 (S.D.N.Y. May 13, 2014) (canine sniffs at commercial building were not searches). <u>See</u> <u>Wymer</u>, 40 F. Supp. 3d at 939, 941.  Nevertheless, the <u>Wymer</u> Court was troubled: "Given the uniquely intrusive nature of continuous and prolonged video surveillance, and the ease with it [(*sic*)] permits law enforcement to evade ordinary checks on their ability to observe the daily activities of citizens, the far better practice is to apply for a warrant."  <u>Id.</u> at 942.

Finally, there is <u>United States v. Anderson-Bagshaw</u>.  There, the Sixth Circuit affirmed the denial of suppression on the theory that portions of defendant's backyard were visible from an adjacent vacant lot.  509 F. App'x 396, 401, 405 (6th Cir. 2012).  Nonetheless, the Court "confess[ed] some misgivings" about allowing "long-term video surveillance of a person's backyard without a warrant[,]" and, noting that any Fourth Amendment violation would be harmless, declined to decide whether long-term video surveillance of curtilage requires a warrant.  <u>Id.</u> at 405.

Several other principles bear mention.  In <u>Jones</u>, the majority specifically noted that <u>Katz</u> did not withdraw any of the protection which the amendment extends to the home.  <u>Jones</u>, 132 S. Ct. at 951 (citing <u>Alderman v. United States</u>, 394 U.S. 165, 180 (1969)).  The majority opinion also impliedly rejects as unsupported, by <u>Knotts</u> or otherwise, the suggestion that an

unconstitutional search is permissible if it produces only public information.[6]  See Jones, 132 S. Ct. at 952.  At the same time, the majority quoted Knotts as recognizing the "limited use which the government made of the signals from this particular beeper," and noted that Knotts "reserved the question whether 'different constitutional principles may be applicable' to 'dragnet-type law enforcement practices' of the type that GPS tracking made possible here."  Id. at 952 n.6 (quoting Knotts, 460 U.S. at 284).  This suggests that the twenty-four-hour dragnet-type surveillance the Court in Knotts warned about may violate the Fourth Amendment even though all of the information gathered is public.  For, in the face of advancing technology, "what a person knowingly exposes to the public," see Katz, 389 U.S. at 351, engenders profoundly different ramifications than it did in 1967, when Katz was decided.

Finally, the Court's opinion cites New York v. Class, 475 U.S. 106 (1986), for the principle that a momentary observation is not a search.  Jones, 132 S. Ct. at 952.  Of course, the converse of that principle, that a lengthy sustained surveillance at some point becomes a search, is precisely the point made by Justice Alito's concurrence in the judgment, in which four Justices joined and for which a fifth, Justice Sotomayor, expressed some support.  Justice Alito observed that "for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving.  We need not identify with precision the point at which the tracking

---

[6] In Knotts, the Supreme Court found that the defendant had no reasonable expectation of privacy in the location of a container being tracked while carried along public roads and onto defendant's property.  460 U.S. at 284-85.  Where the tracking beeper had been placed in the container with the consent of the then-owner, before possession passed to Knotts, and Knotts did not argue the issue, the Court declined to consider whether a trespassory search had occurred Jones, 132 S. Ct. at 951-52 (citing Knotts, 460 U.S. at 278, 279 n.**).  United States v. Karo, 468 U.S. 705 (1984), later determined that similar circumstances did not constitute a trespassory search.  Thus Justice Scalia, writing for the majority in Jones, observed that, contrary to the government's contention, Knotts did not inform the decision at hand, unless, possibly, the government were to argue that an otherwise unconstitutional search could be cured where it produced only public information.  Id.  Justice Scalia then went on to state that the Court knew of no case supporting that proposition.  Id. at 952.

of this vehicle became a search, for the line was surely crossed before the 4-week mark." Id. at 964 (Alito, J., concurring in the judgment).

Considering all these principles, and facing contentions decidedly similar to those advanced by Garcia-Gonzalez, another court suppressed evidence obtained from a pole camera.

In United States v. Vargas, law enforcement officers surveilled the defendant's rural eastern Washington home with a pole camera which continuously recorded activity in the front yard of the defendant's property for more than six weeks.  The camera had panning and zooming capabilities which could be used on the live feed, the live feed could be viewed remotely, and images could be transmitted to law enforcement computers.  Invoking Jones and Jardines, and analyzing under the "reasonable-expectation-of-privacy approach," the Court ruled that such continuous use of a concealed camera, installed off of the defendant's property, required a search warrant to pass constitutional muster.  Order Granting Defendant's Motion to Suppress at 1-2, 12-13, United States v. Vargas, No. CR-13-6025-EFS (E.D. Wash. Dec. 15, 2014), ECF No. 106, available at https://www.pacer.gov.

Vargas set forth a persuasive approach and analysis.  And Vargas is not alone in finding Fourth Amendment problems with extended pole camera surveillance.  In United States v. Houston, 965 F. Supp. 2d 855, 871 (E.D. Tenn. 2013), the Court, relying on Anderson-Bagshaw, concluded that ten weeks (an amount, at most, slightly less than half of the duration of the surveillance in the instant case), "crosses into the unreasonable."[7]  Lengthy, sustained surveillance of a person's home during which the police observe (and record) every coming and going to the home raises substantial privacy concerns.  Several Courts, even when not suppressing, have expressed substantial Fourth Amendment concern regarding continuous

---

[7] The Court did invoke the good faith exception to the exclusionary rule to deny the suppression motion.  See Houston, 965 F. Supp. 2d. at 872.

intrusive video surveillance.  See, e.g., Anderson-Bagshaw, 509 F. App'x at 405 ("[W]e confess

some misgivings about a rule that would allow the government to conduct long-term video

surveillance of a person's backyard without a warrant.  Few people, it seems, would expect that

the government can constantly film their backyard for over three weeks using a secret camera

that can pan and zoom and stream a live image to government agents."); United States v. Nerber,

222 F.3d 597, 603 (9th Cir. 2000) ("Hidden video surveillance is one of the most intrusive

investigative mechanisms available to law enforcement.  The sweeping, indiscriminate manner in

which video surveillance can intrude upon us, regardless of where we are, dictates that its use be

approved only in limited circumstances."); United States v. Cuevas-Sanchez, 821 F.2d 248, 251

(5th Cir. 1987) ("This type of surveillance provokes an immediate negative visceral reaction:

indiscriminate video surveillance raises the spectre of the Orwellian state.").  And five Supreme

Court Justices, in the two concurrences in Jones, emphasized that "longer term GPS monitoring

in investigations of most offenses impinges on expectations of privacy."  132 S. Ct. at 955

(Sotomayor, J., concurring).  Justice Sotomayor remarked that "GPS monitoring generates a

precise, comprehensive record of a person's public movements that reflects a wealth of detail

about her familial, political, professional, religious, and sexual associates."  Id. (Sotomayor, J.,

concurring).  At that, GPS data provides only the "where" and "how long" of a person's public

movements insofar as the person remains close to the monitored vehicle.  Long-term around-the-

clock monitoring of a residence chronicles and informs the "who, what, when, why, where from,

and how long" of a person's activities and associations unfolding at the threshold adjoining one's

private and public lives.

Nonetheless, I must deny defendant's Motion under First Circuit precedent.  In Bucci, the

First Circuit found no Fourth Amendment violation where law enforcement conducted eight

months of surveillance on the front of the defendant's home from a video camera installed

without a warrant on a utility pole across the street.  582 F.3d at 116.  Unlike the instant case, the

agents in Bucci had a basis for probable cause (though, they did not obtain a warrant)—they had

been "advised by a confidential informant ("CI") that Bucci was trafficking marijuana from his

residence . . . .  The CI advised agents that (a) during the CI's ten year acquaintance with Bucci,

s/he had sold narcotics to Bucci on numerous occasions, including several pounds of marijuana;

(b) s/he had delivered marijuana to Bucci's residence, . . . The CI also provided information on

Bucci's age, address, telephone numbers, and positively identified Bucci from a physical

sighting with agents."  Order Denying Motion to Suppress at 1-2, United States v. Bucci, No. 03-

CR-10220-MEL (D. Mass. Dec. 22, 2004) (Lasker, J.), ECF No. 114, available at

https://www.pacer.gov.  Nevertheless, as the government acknowledged below, the video

surveillance revealed no suspicious activity for the first five months in operation.  Order Denying

Motion to Suppress at 9-10.

    With the camera, agents could view the defendant's driveway, a portion of his front yard,

his garage door, and the inside of the garage when the door was open.  Bucci, 582 F.3d at 116;

Order Denying Motion to Suppress at 10.  Agents could not change the view or magnification of

the camera without being physically present.  Bucci, 582 F.3d at 116.  Bucci had erected no

fences, gates, or shrubbery to obstruct the view of the front of his home as seen by the camera.

Id. at 116-17.  Noting that what was in view of the camera was "plainly visible," the First Circuit

concluded, "Bucci has failed to establish either a subjective or an objective expectation of

privacy in the front of his home, as viewed by the camera.  We focus here only on the lack of a

reasonable objective expectation of privacy because this failure is so clear."  Id. at 116-17 (citing

Katz, 389 U.S. at 351).  Although the Court did not elaborate or analyze potential Fourth

Amendment concerns of long-term surveillance aided by ever-advancing technology, it nonetheless held that such surveillance did not constitute a Fourth Amendment violation.  This holding binds this Court.

The Opinion of the Court in Jones did not overrule Bucci, and, unlike the concurrences in Jones, it did not undermine Bucci's legal or analytic foundations.  Rather, it identified an additional (inapplicable in this case) mode of analysis and reserved on considering whether electronic surveillance of extensive duration violates the Fourth Amendment in the absence of a warrant.  See Jones, 132 S.Ct. at 953-54 ("[U]nlike the concurrence, which would make Katz the exclusive test, we do not make trespass the exclusive test.  Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis. . . . It may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question.") (emphasis in original).   In these circumstances, Bucci remains circuit precedent that I am bound to follow.

Accordingly, Defendant's Motion to Suppress (Doc. No. 49) is DENIED.


                                        SO ORDERED.

                                         /s/ Leo T. Sorokin
                                        Leo T. Sorokin
                                        United States District Judge